Filed 5/13/24  In re R.Y. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re R.Y., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>C.H.,<br><br>    Defendant and Appellant. | E082013<br><br>(Super.Ct.No. J280734)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County.  Steven A. Mapes, Judge.  Affirmed.

Liana Serobian for Defendant and Appellant.

Tom Bunton, County Counsel, and Joseph Barrell, Deputy County Counsel, for Plaintiff and Respondent.

1

Defendant and appellant, C.H. (mother), filed two Welfare and Institutions Code section 388 petitions,[1] which the juvenile court denied. A month before the section 366.26 hearing, the court found visits between mother and R.Y. (minor, born Aug. 2009) detrimental; therefore, it discontinued them. Thereafter, the court terminated mother's parental rights as to minor.

On appeal, mother contends the court erred in denying her section 388 petitions without holding evidentiary hearings, in discontinuing mother's visitation with minor, and in declining to apply the beneficial parental relationship exception to termination of her parental rights. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND[2]

On April 5, 2019, personnel from plaintiff and respondent, the San Bernardino County Children and Family Services (the department), received a referral alleging physical abuse by mother and J.K. (boyfriend) to H.H. (born Nov. 2005), general neglect by mother to minor and H.H., emotional abuse by mother to all the children, and emotional abuse of P.K. by boyfriend.[3] Boyfriend was alleged to be a chronic opioid user

---

[1] All further statutory references are to the Welfare and Intuitions Code unless otherwise stated.

[2] By order dated August 31, 2023, we ordered the record in mother's previous appeal in case No. E080337, incorporated in the record in this case. In turn, by order dated December 23, 2022, in case No. E080337, we incorporated the record in case No. E078949, from mother's appeal of the court's order placing minor with the maternal aunt in Arizona. (*In re R.Y.* (June 17, 2022, E078512) [nonpub. opn.] (*R.Y. I*)).

[3] Boyfriend was the biological father of P.K. only. He is not a party to the appeal.

2

due to a back injury. He had stated on multiple occasions that he wanted H.H. out of the house, and that H.H. was ruining their family. Parents acknowledged that boyfriend had been trying to get H.H. arrested for the past one-and-one-half years so that H.H. would be out of the house, and parents would no longer be responsible for him. (*In re R.Y.* (May 15, 2023, E080337) [nonpub. opn.] (*R.Y. II*))

H.H. said he was locked in his room "fulltime." He said that as part of his punishment, parents did not send him to school. He reported sleeping on the floor with a jacket and blanket. H.H. said he had no heat in his room. He reported being physically abused but would not provide examples due to fear of being punished. (*R.Y. II*, *supra*, E080337.)

On April 9, 2019, department personnel received another referral reporting that H.H. and minor were being locked in their rooms; the windows were also locked so that they could not get out. The reporting party said that H.H. stole parent's credit card; boyfriend then "choked him out." The reporting party said parents were "hurting [H.H.] and leaving marks on him and will not send him to school because they do not want the school to see the marks." The reporting party said boyfriend "choked out" mother, possibly in front of the children. (*R.Y. II*, *supra*, E080337.)

Department personnel had previously opened a voluntary maintenance plan with parents on May 21, 2014. The court had detained the children from parents on January 12, 2015, for general neglect. The case was closed on September 30, 2016. On May 13, 2013, a court had previously terminated the parental rights of N.P., the biological father

of H.H. and minor, as to three of their half siblings, and a fourth half sibling on May 5, 2014.[4]  (*R.Y. II*, *supra*, E080337.)

On April 18, 2019, the social worker interviewed H.H. at school.  H.H. said he did not want to get mother in trouble:  "'It's my dad.  My dad said if I tell I would be a ward of the state.'"[5]  H.H. said he was now locked in his room all day and had only a blanket for a bed.  He said "'my dad hits me and chokes me out and one time I even los[t] consciousness.'"  H.H. reported that "'most of the time when my dad hits me or chokes me, it is behind the door and away from the camera.'"[6]  "[O]n the rare occasion when his mother ha[d] observed [boyfriend] hitting or choking him she would jump on [boyfriend] and try to stop him."  The last time boyfriend choked H.H. out was approximately two months earlier.  (*R.Y. II*, *supra*, E080337.)

H.H. reported that boyfriend hit him with boyfriend's fists, sometimes with one knuckle out, which would leave a lump on H.H.'s head.  H.H. demonstrated how boyfriend would choke him by placing him in a headlock.  H.H. said boyfriend also choked mother out four or five times.  He said boyfriend also hit minor, but boyfriend

---

[4]  N.P.'s whereabouts were unknown; he never participated in the case. (*R.Y. II*, *supra*, E080337.)

[5]  H.H. and minor would sometimes refer to boyfriend as their father even though he was not their biological father, and parents were not married. (*R.Y. II*, *supra*, E080337.)

[6]  Parents kept a camera facing H.H.'s bedroom door. (*R.Y. II*, *supra*, E080337.)

never hit P.K.  H.H. was afraid of what would happen if parents found out he had spoken with the social worker.  (*R.Y. II*, *supra*, E080337.)

On April 18, 2019, the social worker went to parents' home.  Mother said she would let H.H. out of his room "'sometimes.'"  She said she kept H.H. locked in his room because he had stolen her credit card information, and the department did not help her with his behavioral problems.  The social worker said the school, the department, the Department of Behavioral Health, and medical doctors had offered the family multiple services.  The children received services at school; parents refused in-home services and had not participated in any services themselves.  Mother declined medication for the children because she believed it was poison. (*R.Y. II*, *supra*, E080337.)

Mother denied boyfriend would hit H.H.  She said H.H. would lie.  H.H. was found in a dark, locked room with a camera facing the door.  His room had dirty, stained carpeting and a single blanket.  The windows appeared to be locked from the outside. Minor's room had a mat with blankets and a pillow on a concrete floor.  There were no working lights in either room.  (*R.Y. II*, *supra*, E080337.)

P.K.'s room "appeared considerably different as it consisted of carpeting, a box spring and mattress with blankets and pillow," furniture, and a light.  P.K. said minor and H.H. would lie about parents.  He reported that he had missed a lot of school.  (*R.Y. II*, *supra*, E080337.)

Boyfriend had a criminal history, which included corporal injury to a spouse, kidnapping, grand theft, criminal threats, and burglary. Department personnel took the children into protective custody. (*R.Y. II*, *supra*, E080337.)

On April 22, 2019, department personnel filed a section 300 juvenile dependency petition alleging, as to mother and minor, that mother knew or reasonably should have known that boyfriend was physically abusing H.H. and minor (a-1 & b-2); that mother failed to provide psychiatric care for H.H. and minor (b-3); that mother failed to provide the children with adequate living conditions (b-4); that mother failed to provide for the children's educational needs (b-5); that mother knew or reasonably should have known that boyfriend was abusing substances (b-6); and that a voluntary maintenance case had previously been opened and closed, yet the children remained at risk of the same issues (j-9). On April 23, 2019, the juvenile court detained the children. (*R.Y. II*, *supra*, E080337.)

In the May 10, 2019, jurisdiction and disposition report, the social worker reported she had called parents on four occasions but was unable to leave a voicemail. On April 30, 2019, the social worker spoke with H.H. who said mother knew boyfriend "'choked me out.'" He said boyfriend also choked out minor twice and mother "too." H.H. said he was not taking his medication because parents did not feel like making appointments to take him to the doctor. (*R.Y. II*, *supra*, E080337.)

Boyfriend reported he had a back injury for which he took opiates. The social worker noted that 51 referrals had been made on the household since June 2010. On June

24, 2019, department personnel amended the petition to add allegations that mother and boyfriend had engaged in domestic violence in front of the children, that mother had allowed minor to be subjected to multiple acts of cruelty by boyfriend, and that mother had performed acts of cruelty to minor. (*R.Y. II*, *supra*, E080337.)

In a first addendum report filed June 25, 2019, the social worker recommended the court deny parents reunification services pursuant to section 361.5, subdivision (b)(6) (severe physical harm to the child or a sibling). Parents declined to be interviewed without counsel present. The maternal uncle reported that boyfriend had held a gun to H.H.'s head when H.H. was three years old. He reported that boyfriend had also previously held a gun to mother's head and made her get in the car and leave. An officer had arrested boyfriend and he spent time in jail. (*R.Y. II*, *supra*, E080337.)

Boyfriend reportedly attempted to commit suicide by hanging himself in a closet. An officer confirmed being called to the home when boyfriend had tried to hang himself. Records from prior cases reflected that both minor and H.H. had been prescribed psychotropic drugs. H.H. refused to visit either mother or boyfriend. (*R.Y. II*, *supra*, E080337.)

Mother had had one supervised visit with minor. After the visit, minor refused visits with the maternal aunt. (*R.Y. II*, *supra*, E080337.)

In an evidentiary interview, H.H. reported being locked in his room for prolonged periods of time. All he had was a blanket. He slept on the ground and was cold all the time except in summer. He said he was often thirsty as he was only allotted half a cup of

7

water a day. He said he once went five days without eating. He was only allowed to sponge bathe outside; sometimes when boyfriend was gone, mother would allow him to shower. He once went three weeks without a sponge bath or shower. (*R.Y. II*, *supra*, E080337.)

H.H. described his life as "'miserable.'" Boyfriend told him multiple times boyfriend would kill him. Boyfriend choked him to unconsciousness on multiple occasions. Boyfriend hit him multiple times in the head leaving bumps. On one occasion, he heard boyfriend choking minor. H.H. said mother told him boyfriend had choked mother. (*R.Y. II*, *supra*, E080337.)

In another interview H.H. reported he was 11 years old when boyfriend attempted suicide by hanging himself with a necktie. H.H. said he repeatedly tried to hang himself like boyfriend. H.H. reported that his biological father touched his penis over his clothes and touched minor's vagina over her clothing. (*R.Y. II*, *supra*, E080337.)

On July 20, 2020, department personnel filed a second amended petition to add allegations that mother failed to ensure minor's psychiatric needs due to her prior sexual abuse and that mother failed to protect minor from sexual abuse. The maternal aunt, who lived in Arizona, had requested placement of H.H. and minor; the department requested placement pursuant to the Interstate Compact on the Placement of Children (ICPC). (*R.Y. II*, *supra*, E080337.)

At the hearing on July 10, 2019, counsel for the department requested that visitation "be found detrimental and suspended." P.K. was purportedly being coached by

8

mother. After visits with minor, there were issues with her behavior. (*R.Y. II*, *supra*, E080337.)

Mother's counsel observed, "I think at this point it would probably be more appropriate to admonish . . . parents and warn them what would happen if they continue to behave in this regard as far as visitation. It's my understanding that both kids, [minor] and [P.K.], do want to see their mother, and it was represented to me that [H.H.], when . . . Mom attempted to visit him, she was told he was not receiving any visitation from either parent." (*R.Y. II*, *supra*, E080337.)

The court found mother's behavior "unacceptable." "The one thing I can do is order an immediate stoppage of the visit and no further visits if there is any behavior that has occurred, such as coaching, passing notes, whispering. If that occurs, I'm giving absolute authority to the Department to stop that visit, and then not allow any further visits." The court ordered visitation between the children and visits between children and parents to occur once weekly for two hours; they were to be "closely monitored." (*R.Y. II*, *supra*, E080337.)

In a September 16, 2019, additional information to the court, the social worker noted that visits had occurred between parents and the children. The social worker noted that mother had initially been referred for services on June 10, 2019; staff had attempted to arrange services for her on three occasions; however, mother was not yet in counseling. The social worker issued another request for services on September 9, 2019.

H.H. said he did not want to go home to mother; he wanted to live with the maternal aunt. (*R.Y. II*, *supra*, E080337.)

In a November 4, 2019, addendum report, the social worker recommended minor be removed from mother and that mother not be provided reunification services. The social worker noted she had obtained the children's school records and there were significant unexcused absences. Personnel from minor's group home had given the social worker a notice to move minor after an incident wherein she struck one of the staff members saying boyfriend "'does it to her mom, so why can't she?'" Minor was placed in a behavioral health facility; personnel from the group home refused to take minor back. After visits with mother, minor became "extremely aggressive[.]" (*R.Y. II*, *supra*, E080337.)

Mother was scheduled to have a visit with minor on June 30, 2019; however, it was cancelled due to minor's behavior. Mother and boyfriend visited with the children on July 10, 2019. Mother visited with minor on August 18, 2019. Minor said she liked visiting with mother. "The mother has been engaged in setting up visits. She sets limits well, has a positive disposition with her younger children." (*R.Y. II*, *supra*, E080337.)

Mother asked for more visitation. The social worker told her "no additional visits were being recommended until she benefitted from services." The social worker wrote that they would have considered recommending mother reunification services if she had "applied herself and could describe what abusive behavior looks like versus healthy behavior, if she left [boyfriend] [who] has abused her on and off since the start of her

relationship and then abused her children, [and] if she were remorseful over allowing [boyfriend] to abuse the children . . . ."  (*R.Y. II*, *supra*, E080337.)

In a November 18, 2019, third addendum report, the social worker indicated she had no additional information regarding mother's participation in any services.[7]  "The children deserve permanency and the mother previously received services for herself and the children while she was living with" boyfriend.  (*R.Y. II*, *supra*, E080337.)

In a fourth addendum report filed January 14, 2020, the social worker reported that on November 24, 2019, parents were involved in a domestic violence incident at boyfriend's residence for which boyfriend was arrested.  On December 17, 2019, defendant pled no contest to misdemeanor battery on a cohabitant (Pen. Code, § 243, subd. (e)(1)) and was sentenced to 60 days in jail.  A court issued a three-year criminal protective order prohibiting boyfriend from having contact with mother.  (*R.Y. II*, *supra*, E080337.)

Mother had eight visits with minor during the reporting period.  Mother and minor bonded during visits.  However, one supervising staff member noted that mother had difficulty setting limits for minor, such as offering to buy her dessert before eating her meal, giving her money, and giving her all the toys she requested.  (*R.Y. II*, *supra*, E080337.)

---

[7]  However, an attached progress report dated September 10, 2019, reflected mother's participation in 10 of 12 ordered sessions of a parenting program, that she had not missed any sessions, and that her participation was deemed satisfactory.  (*R.Y. II*, *supra*, E080337.)

In a June 15, 2020, additional information to the court, the social worker reported that boyfriend had committed suicide on May 22, 2020. After services for boyfriend, "the children were able to spend about [three] hours with their mother in a supervised setting that included lunch." The maternal aunt spoke with minor during the visit. Minor did not ask to visit with the maternal aunt. Minor was in custody at a juvenile facility for felony assault. The social worker recommended minor be placed with the maternal aunt in a planned permanent living arrangement with her sibling, H.H. (*R.Y. II*, *supra*, E080337.)

In an additional information to the court filed October 16, 2020, the social worker reported mother had completed individual therapy, a domestic violence class, and a parenting class. Mother's therapist requested that she re-enroll for further sessions; however, mother failed to re-enroll. A progress note from mother's parenting class reflected that mother's comments did not indicate an understanding of the material; the instructor recommended that mother continue individual treatment; however, mother did not do so. (*R.Y. II*, *supra*, E080337.)

At a hearing on December 7, 2020, it appeared the parties had come to an agreement pursuant to which mother, as to minor, would not contest jurisdiction, and the department would recommend mother have six months of services, with four hours of

supervised visits.  However, after mother's reassessment of and reluctance to accept the offer, counsel for the department withdrew it.[8]  (*R.Y. II*, *supra*, E080337.)

At the contested, combined jurisdiction and disposition hearing on March 1 and 2, 2021, mother testified that H.H. had made false allegations that boyfriend was choking people in the house.  H.H. was a liar.  Boyfriend never choked mother, nor did she ever say that he had.  Mother did not believe boyfriend had physically abused any of the children.  (*R.Y. II*, *supra*, E080337.)

Parents began locking H.H. in his room at night from 8:00 p.m. until the morning at the age of five to keep him from molesting minor.  They had caught H.H. doing "stuff that was really mind-blowing and disturbing."  "He was having intercourse with his sister and trying to convince her that they were going to get married and run away together." From the age of four, "he was trying to insert his penis into her[.]"  H.H. and minor "were acting out sexually inappropriately and also had aggressive, destructive behaviors." "They were smearing feces on the wall.  They were eating their feces.  They were destroying property and aggressive towards others."  (*R.Y. II*, *supra*, E080337.)

H.H. slept on a mat with a blanket and pillow in his room with no electricity.  H.H. did not have a bed for four months because he broke the frame, but he still had a mattress and box spring.  He did not have any bathroom facilities in his room.  He had broken all

---

[8] The long delay between the detention and jurisdiction hearings was due, in part, to repeated conflicts declared between mother and her counsels, which required continuances to allow newly appointed counsel to prepare for the contested jurisdictional hearing.  At one point, counsel for the department objected to the repeated continuances: "I think this is, perhaps, the fifth attorney the mother has had . . . ."  Additional continuances were due to COVID-19 protocols.  (*R.Y. II*, *supra*, E080337.)

the lightbulbs in his room.  The electricity had not been working in his room for at least a couple months.  Mother conflictedly testified both that H.H. was always able to open his windows, and that he could not open his window.  H.H. was allowed to bathe in the house daily.  (*R.Y. II*, *supra*, E080337.)

Parents also locked minor in her room:  "A couple times she had tried running away, and one of the times she had said that she was going to marry her brother, and they were going to live happily ever after.  Another time she didn't really have a reason or rhyme.  She just took off and went to my neighbor's house, and then from there, took off down the street . . . ."  "Because she would sneak out of her room, and we had mountain lions, bears, and bob cats that lived up and surrounded us around our property, and it was extremely dangerous.  Besides, I was worried about her getting picked up by a stranger."  They would lock her in her room whenever she had an outburst, or they had to separate the children.  (*R.Y. II*, *supra*, E080337.)

There was no light, electricity, or lightbulbs in minor's room in April 2019.  There was a mattress in her room.  There was no carpeting in her room.  There was no heat in either H.H. or minor's rooms.  P.K. had a box spring, mattress, electricity, a lamp, and a nightstand in his room.  (*R.Y. II*, *supra*, E080337.)

The children did not go to school when parents had doctors' appointments, which occurred "definitely more than twice a week."[9]  H.H. had not gone to school for three weeks before being taken into protective custody.  There were incidents of domestic

---

[9] Mother wore prosthetics below the knees of both her legs.  Mother was paid as a caregiver for boyfriend and minor.  (*R.Y. II*, *supra*, E080337.)

violence between parents, but not in front of the children; boyfriend was twice arrested for domestic violence.  (*R.Y. II*, *supra*, E080337.)

Prior to the instant proceedings, service agencies evaluated and diagnosed H.H. and minor; agency personnel engaged with them in coaching, therapy, and counseling sessions at least three times weekly.  They were placed on medications.  At one point, both H.H. and minor had been sent to a group home.  However, the services were terminated before they were complete; mother begged them not to close services.  (*R.Y. II*, *supra*, E080337.)

After services were terminated, mother was unable to obtain the children's medications.  She repeatedly requested help from county agencies.[10]  Mother told service agencies that she was locking H.H. and minor in their rooms:  "I felt [ ] they said we were doing the best we could, and keep doing what we were told.  That's exactly what they were trying to tell me since that's what we were there to address was the locks on the doors."  Parents were trying to have H.H. removed from their home due to his behavior. (*R.Y. II*, *supra*, E080337.)

Mother visited with minor in her group home for two hours, once weekly.  When asked if she had missed any visits, mother responded, "There was a time . . . they were getting switched around, and during those times, it made it really impossible to see her." Mother gathered activities in preparation for her visits with minor.  Minor called her

---

[10]  An acquaintance of mother testified that mother had reached out to the department numerous times for assistance.  (*R.Y. II*, *supra*, E080337.)

15

"'Mom.'"  Minor was, "[v]ery happy" to see mother at visits.  Mother loved her children "[w]ith [her] heart and soul."  (*R.Y. II*, *supra*, E080337.)

Mother had engaged in several services, including parenting classes which "has given me a lot of . . . confidence, and I acquired a lot of skills to improve my relationship with my children."  "I've learned to sit and be a good listener.  I've learned to help them be able to work through whatever situations they have with them being able to be calm and not have their outbursts."  (*R.Y. II*, *supra*, E080337.)

During mother's testimony, the court observed of her repeated insistence on answering questions not asked of her, "It makes it look like you're trying to hide something or tailor something.  It affects your credibility whenever you do that.  So you can—you're not going to do that anymore, and if you do it, you have to understand the effect it has on the trier of fact.  That it calls my attention to something that maybe my attention wouldn't necessarily be on . . . .  So that's at your own peril when you do that.  I'm trying to explain to you, and all counsel, when a witness tries to do that, it is definitely a red flag as to credibility."  (*R.Y. II*, *supra*, E080337.)

A social worker with the Department of Aging and Adult Services testified that his job consisted of assessing clients' physical and mental abilities and the areas in which they need help with their daily activities.  Boyfriend and minor were his clients between 2016 and 2019.  He visited parents' home twice a year.  In 2018, minor's room "was bare.  It had no carpet.  It had a pillow and a blanket on the floor, which I was—it was reported to me was used to sleep on.  The window was shut to where it could only open

16

one inch, and that was done because she reportedly attempted to throw her mattress out of the window, so she couldn't escape." He made a referral to the department. (*R.Y. II*, *supra*, E080337.)

Minor had been removed in 2019 because it had been reported, "That she would physically harm herself, pulling out her hair. She would try to run away from the home. She would hit herself." It was reported minor had been sexually abused by her biological father. (*R.Y. II*, *supra*, E080337.)

After testimony, the court noted, "Mother certainly paints a different picture than what the reports say. And I don't believe the picture that she has painted. I think she is still either in denial or is being deceitful when she testifies about certain things or, at least, minimizing to a great extent. Certainly shifting blame." "I think that is part of how [mother] survives mentally, maybe, is to shift the guilt and blame to somebody else." (*R.Y. II*, *supra*, E080337.)

The court sustained the allegations pertaining to minor,[11] and removed her from mother's custody. "And for the [section] [361.5, subdivision] (b)6 bypass, I would agree with the Department's assertion that in this instance the several years of locking the children, especially in the state they were found in the day of removal, when they were left at least five hours alone, locked in a room before [boyfriend] and [mother] came

---

[11] The court indicated that it had previously dismissed the allegations that minor's biological father had sexually abused her, and that mother failed to protect her from such abuse. However, there is nothing in the record to support that statement other than the court's statement itself. The minute order for the date the court made the statement reflects the court dismissed those allegations that day. (*R.Y. II*, *supra*, E080337.)

17

home, you know, I think that is indicative of what was always happening." "And so I think that was definitely cruel to where the children had to soil themselves or scream to be allowed to go to the bathroom, not have access to food like was needed. In an emergency situation, had there been a fire or a flood, they would not have been able to get out of that situation." (*R.Y. II*, *supra*, E080337.)

"I believe the facts as presented by [H.H.], and I do believe he was choked out to the point of unconsciousness as stated. I believe all of the things that he has reported in those papers, over Mother's assertions. Mother's assertions, again, have been self-serving, and only at some point when she was forced to talk about [domestic violence] did she start to admit that." "I do not believe [boyfriend's] death removes Mother's risk to the children. Mother is clearly a risk to the children by her parenting styles and by allowing [boyfriend]—and, frankly, I think she was a part of it. So, you know, doing the locks and all of that, there's no doubt in my mind that this is severe physical abuse." (*R.Y. II*, *supra*, E080337.)

The court denied mother reunification services as to all the children and set the section 366.26 hearing as to P.K.[12] The court set visitation as one hour monthly. The court authorized assessment of the maternal aunt pursuant to ICPC requirements. (*R.Y. II*, *supra*, E080337.)

In the August 24, 2021, status review report, the social worker recommended a "permanent plan . . . with a fit and willing relative . . . ." The social worker noted that

---

[12] On February 2, 2022, the court terminated mother's parental rights as to P.K. Mother appealed. We affirmed the judgment. (*R.Y. I*, *supra*, E078512.)

18

approval of the ICPC to place minor with the maternal aunt was still pending. Minor had had several placement changes. (*R.Y. II*, *supra*, E080337.)

Mother had visited via Zoom, once monthly, which minor reported went "really well." "During this reporting period [minor] remains hopeful that she will be placed with her maternal aunt as she has expressed often she would like to live with her maternal aunt in Arizona. She reports that she is excited with the idea[ ] of having the opportunity to live like a regular teen with her aunt and cousin. She reports that her visits with her mother, [ ] are going well and she looks forward to visiting with her mother." (*R.Y. II*, *supra*, E080337.)

At the hearing on September 3, 2021, the court adopted the department's proposed findings and ordered that minor's current placement and a permanent plan of placement with a relative was appropriate. On February 15, 2022, the court granted mother's counsel's motion to be relieved as counsel. (*R.Y. II*, *supra*, E080337.)

In the February 25, 2022, status review report, the social worker noted that the ICPC approval was still pending. Mother had continued to visit with minor once monthly on Zoom. Minor again reported "that her visits with her mother are going really well." (*R.Y. II*, *supra*, E080337.)

"On July 4, 2021, [minor] had a visitation with her maternal aunt and cousin. On January 17, 2022, the mother . . . visited with the child [ ] at the placement." Minor remained "hopeful that she will be placed with her maternal aunt as she has expressed often she would like to live with her maternal aunt in Arizona." "She reports that her

visits with her mother, . . . are going well." The court found minor's placement appropriate and continued to grant authority to place minor with the maternal aunt once approved pursuant to the ICPC. (*R.Y. II*, *supra*, E080337.)

In a March 17, 2022, additional information for the court, the social worker reported that the maternal aunt had been approved for placement. Minor was removed from her placement and placed with the maternal aunt on March 12, 2022. The maternal aunt reported that minor was adjusting well to the home. (*R.Y. II*, *supra*, E080337.)

At the hearing on March 25, 2022, mother's counsel objected to the placement. Minor's counsel agreed to the placement. The court approved placement with the maternal aunt. The court ordered supervised, in person visits once monthly for two hours in Arizona; the court also ordered additional telephone and video visits. (*R.Y. II*, *supra*, E080337.)

Mother's counsel filed an appeal on behalf of mother from the order placing minor with the maternal aunt. Mother's appellate counsel filed a brief pursuant to *In re Sade C.* (1996) 13 Cal.4th 952, raising no issues and requesting this court to independently review the record for error. This court dismissed the appeal as abandoned. (*R.Y. II*, *supra*, E080337.)

In a status review report filed on September 7, 2022, the social worker recommended the court set a section 366.26 hearing as to minor and order adoption as the permanent plan. In the maternal aunt's home, minor had "access to all other maternal relatives." Minor received phone calls from her brother, H.H. The maternal aunt

reported minor was "doing very well" in the placement; she was attending school every day without incident. (*R.Y. II*, *supra*, E080337.)

Mother continued to visit with minor once monthly for two hours. The maternal aunt reported that mother continued to purchase minor whatever she wanted; minor would ask for things because she knew mother would buy them immediately. "Once they are received . . . [minor] places the things in a corner and doesn't use the items and it adds to [minor's] tendency to hoard." (*R.Y. II*, *supra*, E080337.)

Mother would tell minor that mother intended to get custody of minor back; mother would also bring up boyfriend, whom she would represent as "a good guy." Minor had "no overwhelming reaction to saying hello or goodbye to her mother. When it is time to end the visits, [minor] will get in the car and say let's go. [Mother] is the one [who] tries to prolong goodbyes after a visit." (*R.Y. II*, *supra*, E080337.)

Minor had 13 prior placements. Her "behaviors ranged from oppositional, defiant, cussing[,] and temper tantrums. Since she has been placed with her maternal aunt, . . . the majority of her behaviors have lessened." The maternal aunt was "committed to caring for [minor] to the level of adoption and wants to move forward with the process of adoption." (*R.Y. II*, *supra*, E080337.)

In an October 27, 2022, additional information for the court, the maternal aunt reported minor was "doing well in the home." Mother last visited with minor on October 7, 2022. The visit went "very well." However, the maternal aunt reported that mother continued to purchase items at minor's request which minor left unopened and

21

unused in a corner of her room. One of minor's teachers reported that minor had "made amazing progress." (*R.Y. II*, *supra*, E080337.)

On November 7, 2022, mother filed a section 388 petition seeking to change the court's order of once monthly, two-hour, supervised visitation, to three times monthly, four-hour, unsupervised visitation.[13] Mother alleged as changed circumstances that she had consistently visited minor, minor had responded to mother positively, and minor enjoyed the time spent with mother during visits. Mother alleged the change would be in the best interest of minor because minor had communicated with mother with emojis reading "'love you'" and "'miss you.'" Mother also asserted the change would be in minor's best interest because minor was bonded with mother and would benefit from increased time with her. (*R.Y. II*, *supra*, E080337.)

At the hearing on November 8, 2022, mother's counsel indicated he "ha[d] an un[a]voidable conflict and a breakdown of attorney-client relationship, so I would ask the Court grant new counsel for the mother." The court appointed new counsel for mother. (*R.Y. II*, *supra*, E080337.)

The department asked, "the Court to dismiss the mother's [section] 388 [petition] as it does not meet even prima facie levels of proof." The court responded, "Can you explain to me why it doesn't . . . it sounds like they're having positive visits, so if you can

---

**13** In the alternative, mother requested increased "supervised visits to three times per month for up to four hours" or, increased "supervised visits to twice per month for up to four hours . . . ." (*R.Y. II*, *supra*, E080337.)

explain to me why it doesn't meet prima facie, which is a very low level?" (*R.Y. II*, *supra*, E080337.)

Counsel for the department responded, "At this point, your Honor, we are going to be going to a [section] [366].26 [hearing]. The mother is already getting extended visits, 5 to 6 hours, instead of 2, but I would note there really isn't [a] change of circumstances. The mother's behavior at this point does not meet the prima facie level for change of circumstances. [¶] As outlined in the [section] [366].26 report, she continues to try to pressure the minor to move back home. She brings up the [boyfriend] in conversation stating he loves her and tries to bring up memories for the minor. The minor has no reaction to the visits ending with the mother, even though the mother tries to prolong those goodbyes. The mother continues to buy the minor whatever she wants despite the concerns regarding the minor's hoarding tendencies. [¶] Ultimately, it doesn't meet best interest either as [minor] is doing very well in school. She has an IEP. She is attending therapy, and she is stabilizing. Any unsupervised visitation with the mother would be, in my opinion, a threat to the minor's stability and potentially her safety as well, given the mother's lack of boundaries and ability to be appropriate." (*R.Y. II*, *supra*, E080337.)

Mother's counsel argued, "I don't see any kind of detriment or any harm to the child, other than the gifts . . . but I think the[ ] [visits] are going well, and I think it is in the best interest of the child to have Mom spend more time. She does travel all the way to Arizona to make these happen, and she has been very consistent, even with that obstacle in the way, and the minor seems to be bonded with the mom. She misses her.

She does enjoy being visited by her mom, and so that's why we're asking for more frequent visits or longer visits." (*R.Y. II*, *supra*, E080337.)

Minor's counsel objected to unsupervised visits noting, "minor is finally stabilizing in this case." "Mother's still making inappropriate statements to the child. And does she love her? I'm not objecting to that. I think she does, but I think we need to leave it as it is and let this minor continue to stabilize, and that's what would be in her best interest." The court noted it was "going to deny the prima facie [showing] for not [being] in the best interest on those grounds for all the reasons stated by [the department] and Minor's counsel, over Mom's objection." (*R.Y. II*, *supra*, E080337.)

Mother appealed. We affirmed the order. (*R.Y. II*, *supra*, E080337.)

In an additional information to the court filed January 5, 2023, the social worker reported that mother continued to have supervised visits with minor monthly: "The caregiver describes the visits as 'inappropriate' which consists of the mother buying the . . . child many things which the child does not use later or buying the minor plunging bras. Additionally, the child and mother argue during visitations at times." Minor continued to do well in the maternal aunt's home. At the hearing on January 5, 2023, at mother's request, the court appointed a guardian ad litem (GAL) for her.[14]

---

[14] The court noted, "to be clear, as a GAL in this case, it's very limited. You're not to make decisions for mom, you wouldn't have – you're not that type of GAL." "[Y]our role is limited to facilitating attorney-client communication." "[Y]ou're not to be present for interviews between the Department and mother." The "GAL" accepted "this very tailored and limited role . . . ."

Mother filed a notice of intent to file an extraordinary writ petition from the January 5, 2023, order, which we dismissed on January 20, 2023, as premature. (See case No. E080519.)

In the January 18, 2023, additional information for the court, the social worker reported that the maternal aunt would like to adopt minor if mother failed to reunify with her. "The child states she does not like to visit with her mother. [Minor] states she is frustrated with the lies that her mother is telling . . . the Court and that [she] and mother just fight during the visits." The maternal aunt disclosed that minor would "tell her she does not want to visit with . . . mother prior to the visits, but that [minor] ends up attending the visits as she feels obligated as she does not want to disappoint . . . mother. Additionally, it is reported that mother attempts to manipulate [minor] with gifts and promises to purchase items for her." The maternal aunt reported that after visits, minor "tends to have difficulty staying asleep . . . exhibit[ing] nightmares and wets the bed." She also tended "to exhibit more clinginess and . . . remain[ed] with the [maternal aunt] constantly at her side, until [minor] regulates back into routine and feels secure again."

Mother was visiting minor in-person or by telephone once monthly for two hours. The social worker recommended the court find mother's visits detrimental and set the section 366.26 hearing.

At a hearing on January 20, 2023, scheduled to determine whether to set the section 366.26 hearing, minor's counsel asked the court to "suspend the visitation until we get the next report . . . then, we can have a hearing and see how we want to proceed." The court ordered mother be permitted to continue to visit with minor under strict supervision: "Mom's ordered not to discuss the case, the possibility or the outcome with the minor." "There's no whispering. No secrets, you know, whatever. No gifts. No . . .

25

type of manipulation. Whoever is supervising at [the department] [must] not take lightly that this minor's 15; that they . . . have to pay attention and be aware of this history so they can shut it down. And I'll give authority for [the department] to immediately suspend any visit and future visits if Mom violates any of the rules that" the department "established for the minor's protection."

Minor's counsel asked that "minor not be forced to visit. If she . . . refuses to visit, she doesn't have to go." The court agreed. The court set the section 366.26 hearing.

The social worker filed the section 366.26 report on May 19, 2023; she recommended the court terminate mother's parental rights to minor. Minor had been in the maternal aunt's home since March 12, 2022. "The child has been observed to be happy, smiling[,] and bonded with the [maternal aunt]" "The child states she wants to remain in the home and be adopted by her aunt". "The child is placed with the maternal aunt who is approved for adoption and who desires to raise the child permanently. The maternal aunt appears to be meeting the child's needs now and willing to continue to meet her future needs as well. The child[] is in a stable home environment under the care and custody of [the maternal aunt.] [The maternal aunt] will continue to provide . . . adequate food, clothing, shelter, medical care, and education for the child."

The maternal aunt had provided for minor "and includes her as a part of her home. This has included family trips, family outings with extended family members[,] and important family traditions. The closeness of the child's relationship with the maternal aunt has been noticeably observed by the Department's staff."

26

Mother and minor had supervised visits once monthly in person for two hours. "Mother continues to attempt to give the child gifts at her visits despite the Court orders and being told on several occasions that gifts are not allowed per Court orders." Minor "ended each visit with her mother early by approximately 30 min[utes] to one hour." "It is reported after visits, the child tends to experience increased negative behaviors that include nightmares and mood swings." Minor became "emotional[ly] upset with . . . mother reporting that . . . mother is lying to the Court."

In an additional information to the court filed May 15, 2023, the social worker noted minor had stopped each monthly visit early since the last court hearing. In a therapist's report, minor was reported as saying she did not get along well with mother. Minor reported her anxiety got worse in the lead up to visits with mother. When there was a gap in visitation between she and mother, minor's negative behaviors decreased. Minor reported she no longer wanted visits with mother as it is a "stressor" for her. Minor did not want to be part of mother's "drama."

On May 22, 2023, mother's counsel filed a section 388 petition seeking to set aside the court's order appointing a GAL. On June 16, 2023, the court granted the section 388 petition and relieved the GAL.

In an additional information for the court filed July 6, 2023, the social worker reported minor visited with mother on June 17, 2023; minor "chose to stay the entire [two] hours of the scheduled visit with the mother." Mother continued to make

27

statements to minor during the visits in which she promised various items to minor once "mother straightens things out with the judge."

On August 8, 2023, mother's counsel filed another section 388 petition requesting the court reclassify minor "so that she may receive proper intensive mental healthcare as per her civil rights . . . ." At a hearing on August 10, 2023, the court found mother's visits with minor detrimental, ended all visitation between them, and continued the section 366.26 hearing. The court orally indicated it would review the section 388 petition. An order issued on the same date reflects that the court denied the petition for failure to state new evidence or a change of circumstance and, apparently, because it was the subject of "a class action lawsuit."

On August 16, 2023, mother filed a notice of intent to file a petition for extraordinary writ from the August 10, 2023, order. On August 22, 2023, we dismissed the petition as untimely because the section 366.26 hearing had been set on January 20, 2023, more than seven days before mother filed the notice of intent.

On August 25, 2023, mother's counsel filed a notice of appeal from "all findings and orders" made on August 10, 2023. In an additional information for the court filed September 6, 2023, the social worker reported minor was "acting out evidenced by tantrums, ang[ry] outbursts, name calling/disrespect[,] and being more overall emotional. In speaking with [minor] alone, she stated that she is feeling frustrated and irritated that [the matter] keeps getting continued and just wants it to be over. The child continues to report she wants to be adopted."

28

On September 6, 2023, mother's counsel filed a fourth section 388 petition requesting a stay of the section 366.26 hearing, visitation, and the provision of reunification services. Mother alleged as changed circumstances her completion of her case plan and continued participation in services, which included: completion of a parenting education course on September 24, 2019; completion of another parenting education program on January 20, 2022; completion of a five hour mental wellness course on March 11, 2020; and continued participation in weekly therapy since February 10, 2023, as reflected in a progress letter dated August 9, 2023. Mother alleged the requested change would be in minor's best interest because "[t]he fact that [minor] so desperately needs her mother back in her life is unquestionable."

At the hearing on September 7, 2023, the court allowed mother's counsel the opportunity to argue whether she had made a prima facie showing on the section 388 petition: "I can tell you what is lacking for me is the prima facie [showing] of best interest to the child." Mother's counsel argued "I think it's clear that Mother has done quite a bit . . . ." "[S]he is really working hard." "[S]he is improving herself." "[Minor] has a close bond with her mother. I don't think [minor] understands that this hearing is about removing . . . mother from her life completely." Mother's counsel argued mother had been instrumental in obtaining the psychiatric help minor needed: "[H]ow is it not in the best interest of Mother—for [minor] if she is going to have her mother walking her through everything step by step, helping her get the services she needs, helping her through school, helping her through therapy."

Minor's counsel argued, "I believe Mother is making progress, but I don't believe she has made a complete change as of today, and as to the best interest, [minor] is very clear. She does not want to return to Mother's care. She wants to stay where she is at. She also indicated in the May report that she was upset with Mom for lying to the Court. She wants to remain in the home, and she wants to be adopted. She has been getting upset lately, and she does want these . . . proceedings to be over with because she wants to be adopted, and she wants Mother to quit trying to intervene with that process. . . . [I]t is not in her best interest to grant this [section] 388 [petition]. It's not even a prima facie [showing]."

The department agreed with minor's counsel: "There is not [a] prima facie [showing] for [either] change of circumstances [or] best interest. The majority of the documentation [are] historical certificates from 2019 and 2020." "The only somewhat relevant document is Exhibit B, which indicates she is participating in therapy. I would note that the document indicates she has been in therapy since February of 2023 and has attended 28 sessions. I would note the therapist did not indicate that they had any of the [department's] reports, and this Court did not authorize release, so they should not have had those reports. Meaning, the therapist was not aware of the issues related to removal or the ongoing issues with the mother engaging with the minor inappropriately. [¶] The therapist's opinion is the mother has learned valuable communication skills to help her better observe and relate to [minor] and be there for her in times of need. That statement

alone shows the therapist is utterly unaware when treating the mother about . . . mother's concerning behavior, and [minor's] feeling about the mother."

The court indicated it had "read and reviewed the [section] 388 [petition]. I don't have to have a hearing on that. It's really a chambers thing, but because we're here, this is the time that I've decided to just put it out there and give everybody an opportunity to be heard on whether . . . there is [a] prima facie [showing]. I do agree that there is changing circumstances, prong one. I was impressed that Mother's been in therapy since . . . February of this year. I read the therapist's take, but the shortcomings are what [the department] pointed out, and the other things I saw were completions from 2019 and 2020, which were, obviously, dated before I would make dispo[sitional] orders, . . ." "It's probably changing circumstances on prong one."

The court continued, "On prong two, there is no showing of best interest, other than bootstrapping argument of, well, she is the mother. She knows, and things the therapist said. But really, without specifics, there's no prima facie of best interest at all. So I deny Mother's [section] 388 petition."[15]

The court then moved on to the contested section 366.26 hearing. Mother testified that minor's reaction to mother at the beginning of visits "depends on if my sister is with her. If my sister is with her, she is a little stand-offish. If she just gets dropped off, she seems open and happy and will give me a hug." "If we're at the restaurant, [minor] gets very bo[red] there very easily. But when we were at the park, she was, kind of, shocked

---

[15] The order reflects that the court found the request did not state new evidence or a change of circumstance.

31

that our visit was ending because I don't think she thought it was long enough, or that we had gone through the time that fast." They express affection toward one another "All the time." The reduction in the frequency of visits became "really hard for [minor] because she is used to being able to see me and feel free to have fun and do what we want." "She seems more depressed. She seems exhausted. At times she has told me that she just wants to be done with . . . this court stuff, and she just doesn't seem like what I'm used to seeing. You can tell it's had a pretty negative impact on her."

During one visit, "the social worker said that [minor] wanted to leave, and I asked 'why,' and she said that [minor] asked to leave, and if she wants to leave, she's allowed to." That happened approximately three times.

Mother never brought up the case. However, minor did. Mother "told her we weren't allowed to talk about the case, but I had brought a lot . . . of stuff to do with her, and I wanted to make sure that we got to have fun on our visits." "I knew that I wasn't allowed to bring any gifts, so I never offered to give her anything because I knew that would be used against me."

Mother expresses her love for minor, which appears to make minor happy. "She seems to be willing to return the love, and I have not had any indication that she did not want to see me at all. She has never told me she didn't want to see me." Mother never progressed to unsupervised visitation.

The department argued, "The mother has failed to prove the parent-child bond exception to adoption in this case." Mother "has brought gifts, made promises she

32

[cannot] keep, [and] made false allegations attempting to get the minor removed from the caregiver." "[T]he mother continued to [give] gifts despite being told not to." Minor "ended each visit with the mother approximately 30 minutes to one hour early." "[M]inor indicated she does not like visiting her mother. She is frustrated with the lies her mother is telling the Court, and that she and the mother fight during visits." "[M]inor does not want to visit . . . mother because she is a stressor for her."

Minor "has been in foster care since 2019. She has been stable in her aunt's care for over a year, and the mother continues to be a source of anxiety, upset, and d[y]sregulation for the minor. The mother has not taken accountability for her behaviors and continued to violate the Court's orders and discuss the case with the minor and bring unapproved gifts."

"The minor does struggle behaviorally, and those behaviors seem to be largely related to this case and the mother's behavior. It appears the minor is truly not generally adoptable, so we are asking the Court find she is solely specifically adoptable. In light of all the evidence, we are asking the Court to terminate parental rights and free the minor for adoption as there are no exceptions to adoption."

Mother's counsel argued there was "a 12-year bond between a mother and a daughter – that's a serious bond, your Honor, whether it was healthy, not healthy, or whatever you want to paint it. It—there's nothing that can touch that or that is like that bond. And to create this legal death of this relationship . . . I can't see anything but detriment coming from that." "I just don't think [minor] is able to articulate what needs

33

to be articulated . . . for the Court to see this important bond. But the detriment from removing her mother from her life forever—I don't think you can qualify that." "And to destroy that bond, your Honor—I[t's] just . . . heartbreaking."

Minor's counsel joined with the department's arguments: "Mother has presented no evidence to show that there is a parental-child bond where it would be detrimental to terminate that. In fact, [minor] has been clear. She doesn't even want to visit with Mom. She does it out of obligation, and then when the visits [are] over she tends to stress and be anxious . . . . It's not in her best interest to consider anything other than terminating parental rights."

The court found clear and convicting evidence minor was specifically adoptable. The court furthermore found mother had regular visitation with minor despite its recent finding that such visitation was detrimental to minor. As to whether mother and minor had a substantial bond such that termination of mother's parental rights would be detrimental, the court noted it "was flabbergasted" by mother's testimony her children were her number one priority and came before anything else in her life. "That was a big wow for me. Because that was [a] horrible insight by her. I think she believes that, and that's even more scary." "[I]n light of totality of the case . . . it shows absolutely no insight on her behalf after all these years and in therapy."

Moreover, "The idea that just because somebody was a parent for 12 years is automatic ipso facto, as it were, a bond is not true." The court terminated mother's parental rights finding it would not be detrimental to minor to do so.

34

## II. DISCUSSION

Mother contends the court erred in denying two of her section 388 petitions without holding evidentiary hearings, in discontinuing mother's visitation with minor, and in declining to apply the beneficial parental relationship exception to termination of her parental rights. We affirm.

### A. Section 388 Petitions

Mother contends "the juvenile court's repeat[ed] denial of mother's section 388 petitions without a hearing . . . created a pattern that culminated to den[y] [her] constitutionally protected rights to freedom of speech and meaningful access to the courts under the first and fourth amendments of the United States Constitutions. At the minimum, the court applied the wrong legal standard and abused its discretion in denying mother's petitions." We disagree.

Section 388 primarily permits a parent to petition the court "to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court." (§ 388, subd. (a)(1).) "To prevail on a section 388 petition, the moving party must establish that (1) new evidence or changed circumstances exist, and (2) the proposed change would promote the best interests of the child." (*In re J.T.* (2014) 228 Cal.App.4th 953, 965.) "Under section 388, a party 'need only make a prima facie showing to trigger the right to proceed by way of a full hearing.' [Citation.] The prima facie showing is not met unless the facts alleged, if supported by evidence given credit at the hearing, would sustain a favorable decision on the petition. [Citation.] In determining whether the

35

petition makes the necessary showing, the court may consider the entire factual and procedural history of the case. [Citation.] The petition must be liberally construed in favor of its sufficiency." (*In re J.P.* (2014) 229 Cal.App.4th 108, 127.)

"Section 388 thus gives the court two choices: (1) summarily deny the petition or (2) hold a hearing." (*In re Lesly G.* (2008) 162 Cal.App.4th 904, 912; contra, *In re G.B.* (2014) 227 Cal.App.4th 1147, 1158, fn. 5 [allowing argument on whether the mother had made a prima facie case in a § 388 petition "benefitted her by giving her the opportunity to establish a record supporting her request for an evidentiary hearing"].)

"The juvenile court may modify an order if a parent shows, by a preponderance of the evidence, changed circumstance or new evidence and that modification would promote the child's best interests. [Citations.] This is determined by the seriousness of the problem leading to the dependency and the reason for its continuation; the strength of the parent-child and child-caretaker bonds and the time the child has been in the system; and the nature of the change of circumstance, the ease by which it could be achieved, and the reason it did not occur sooner. [Citation.] After termination of services, the focus shifts from the parent's custodial interest to the child's need for permanency and stability. [Citation.] 'Whether a previously made order should be modified rests within the dependency court's discretion, and its determination will not be disturbed on appeal unless an abuse of discretion is clearly established.' [Citation.] The denial of a section 388 motion rarely merits reversal as an abuse of discretion." (*In re Amber M.* (2002) 103 Cal.App.4th 681, 685-686.)

"A petition which alleges merely changing circumstances and would mean delaying the selection of a permanent home for a child to see if a parent, who has repeatedly failed to reunify with the child, might be able to reunify at some future point, does not promote stability for the child or the child's best interests." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 47, overruled on other grounds in *In re Caden C.* (2021) 11 Cal.5th 614, 636 (*Caden C.*).)

Even if the juvenile court errs in failing to hold an evidentiary hearing on a section 388 petition, that error will be held harmless unless there is a reasonable probability that in the absence of the error a result more favorable to the petitioner would have been reached. (*In re J.P.*, *supra*, 229 Cal.App.4th at pp. 128-129 [harmless where juvenile court erroneously failed to hold a hearing on a § 388 petition]; *In re G.B.*, *supra*, 227 Cal.App.4th at p. 1162 [erroneous denial of hearing on second § 388 petition harmless where hearing was granted on first petition and where petitioner failed to identify additional evidence she would present at hearing]; *In re Victoria C.* (2002) 100 Cal.App.4th 536, 544 [erroneous denial of hearing on § 388 petition harmless where juvenile court had considered evidence attached to petition in periodic review hearing].)

    1.  *First Section 388 petition.*

On August 8, 2023, mother's counsel filed a section 388 petition requesting the court reclassify minor "so that she may receive proper intensive mental healthcare as per her civil rights . . . ." The court denied the petition for failure to state new evidence or a

change of circumstance and, apparently, because it was the subject of "a class action lawsuit."

First, section 388 relief would not appear to lie for the purpose posed by mother's first petition. Mother does not identify the juvenile court order which she proposes "to change, modify, or set aside . . . ."[16] (§ 388, subd. (a)(1).)

Second, minor was receiving mental health services including the prescription of psychotropic medications, periodic review of her psychotropic medications, a telephonic psychiatric visit, and "services to accommodate her needs."

---

[16] Mother's counsel submitted the petition on a Judicial Council Forms, form JV-180, request to change court order, but under each line item on which mother's counsel should have identified the order of which she was requesting a change, the changed circumstances, and how the requested change would be in minor's best interest, mother's counsel answered, "Please see attached." However, nowhere in the attached documents did mother answer these questions. Rather, the numerous attached documents are simply exhibits, without argument, purporting to support the request. (See *Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956 [issues raised but not supported by adequate argument or authority may be deemed forfeited].)

Mother's counsel below did identify the order she was asking the juvenile court to make, not modify: "To immediately enact [minor's] Katie A. Subclass status through the County of San Bernadino Department of Behavioral Health so that she may receive proper intensive mental healthcare as per her civil rights established in Katie A. v. Bonta." Mother's counsel below did not give a citation for the case, which she asserted supported the relief requested in petition. Mother's counsel on appeal similarly does not give a citation for the case. The most recent published case citation we can find is *Katie A., ex rel. Lundin v. Los Angeles County* (2007) 481 F.3d 1150 (*Katie A.*), which reflects a class action suit wherein the children's class was seeking, "where medically necessary, [to] provide the children with the forms of mental health care known as wraparound services and therapeutic foster care." (*Id.* at p. 1151.) The *Katie A.* court reversed and remanded the district court's issuance of a preliminary injunction in favor of the children. (*Id.* at p. 1163.) The court in *Tinsley v. Faust* (2019) 411 F.Supp.3d 462, more recently cited *Katie A.* for the proposition that the state is required to provide certain medically necessary services consistent with the Medicaid Act. (*Id.* at pp. 472-473.)

Minor had an IEP and attended full time special education classes overseen by a psychiatrist. An Arizona social worker provided services, which included monthly monitoring of minor's mental health needs. Minor attended individual therapy twice monthly. (*R.Y. II*, *supra*, E080337.) Mother fails to identify precisely how and why the mental health protocol mother prefers would benefit either minor or mother in anything but a purely speculative manner.

Third, mother failed to specifically identify the change of circumstance or new evidence which would permit the court to order new mental health services. (See fn. 16, *ante*; *In re N.F.* (2021) 68 Cal.App.5th 112, 120-121 ["The change in circumstances supporting a section 388 petition must be material. [Citations.]"]; *In re S.R.* (2009) 173 Cal.App.4th 864, 870 ["The change[d] . . . circumstances must relate to the purpose of the order and be such that the modification of the prior order is appropriate."].)

Fourth, mother failed to identify how the proposed mental health protocol would be in minor's best interest. (See fn. 16, *ante*.) Fifth, any error in failing to hold an evidentiary hearing was harmless because the court considered all the evidence attached to the petition and disbelieved mother's testimony at the section 366.26 hearing. (*In re Victoria C.*, *supra*, 100 Cal.App.4th at p. 544.)

*2. Second Section 388 Petition.*

Mother's September 6, 2023, section 388 petition requested a stay of the section 366.26 hearing, reinstatement of visitation, and the provision of reunification services. Mother alleged as changed circumstances her completion of her case plan and continued

39

participation in services, which included: completion of a parenting education course on September 24, 2019; completion of another parenting education program on January 20, 2022; a certificate of completion of a domestic violence education class dated January 23, 2020; completion of a five hour mental wellness course on March 11, 2020; and continued participation in weekly therapy since February 10, 2023, as reflected in a progress letter dated August 9, 2023.

First, mother failed to identify a change of circumstances that would permit to the court to grant the relief requested. As the department and court noted, most of the documentation in support of the petition consisted of certificates from 2019 and 2020, which predated not only the court's August 10, 2023, order finding mother's visits with minor detrimental, but even its order of March 2, 2021, denying mother reunification services. (*R.Y. II*, *supra*, E080337.) Even the latest certificate of completion of a second parenting education program on January 20, 2022, predated the visitation order by more than a year and a half.

The only alleged change of circumstances since the court's order denying mother reunification services consisted of her completion of a second parenting program and the continued participation "in at least 31, 50 minute weekly individual sessions, sometimes twice weekly, since February 10, 2023." However, as the department noted, the therapist's report did not reflect he understood any "of the issues related to removal or the ongoing issues with the mother engaging with the minor inappropriately." "[T]he therapist is utterly unaware when treating the mother about the mother's concerning

40

behavior, and the child's feeling about the mother." The court found mother's testimony reflected, "in light of totality of the case, . . . absolutely no insight on her behalf after all these years and in therapy."

Thus, the court found there were "changing" circumstances but not changed circumstances. (*In re Casey D.*, *supra*, 70 Cal.App.4th at p. 47.) The court, in considering the entire factual and procedural history of the case, acted within its discretion in determining that mother had failed to make a prima facie showing of a change in circumstance.

Second, there was no evidence that resuming visitation or granting mother reunification services was in minor's best interest. As we wrote in affirming mother's prior appeal from an order denying an earlier section 388 petition, "Early on, after a visit with mother, minor refused visits with the maternal aunt. Minor had behavioral issues after some visits, including becoming 'extremely aggressive.' Mother had difficulty setting limits for minor, giving her everything she wanted. Mother communicated with minor inappropriately, telling her that mother intended to get custody of minor back and representing the boyfriend as 'a good guy.' Moreover, minor showed no real negative reaction to visits ending." (*R.Y. II*, *supra*, E080337.)

Things appear to have gotten progressively worse since that appeal. Mother continued to inappropriately purchase things for minor and talk about the case even after a court order barring such. Minor and mother would argue during visits. "[Minor] states

41

she is frustrated with the lies that her mother is telling . . . the Court . . . ." Minor told her therapist she did not get along well with mother. Minor started ending each visit early.

After visits, minor had difficulty "staying asleep . . . exhibit[ing] nightmares and wet[ing] the bed." She also tended "to exhibit more clinginess . . . with the [maternal aunt] constantly at her side, until [minor] regulates back into routine and feels secure again." She had "increased negative behaviors that include . . . mood swings." Minor reported her anxiety got worse in the lead up to visits with mother. When there was a gap in visitation between she and mother, minor's negative behaviors decreased. Minor reported that she no longer wanted visits with mother as it is a "stressor" for her. Minor did not want to be part of mother's "drama." The court found that mother's visitation with minor was detrimental and ended all visitation. (*In re D.B.* (2013) 217 Cal.App.4th 1080, 1094 [No abuse of discretion in terminating post reunification visitation where visits led to negative reactions by the children.])

The court found "what is lacking for me is the prima facie of best interest to the child." "[T]here is no showing of best interest . . . ." The court's finding that the requested relief was not in minor's best interest was well within its discretion.

Mother argues that if her testimony at the contested section 366.26 hearing had been permitted at an evidentiary hearing on her second section 388 petition, "mother would have had a high probability of meeting the second prong of the petition and obtaining at least one of the requested reliefs . . . ." However, mother fails to acknowledge that the court found mother's testimony uncreditable. The court noted it

42

"was flabbergasted" by mother's testimony that her children were her number one priority and came before anything else in her life. "That was a big wow for me. Because that was horrible insight by her. I think she believes that, and that's even more scary." "[I]t shows absolutely no insight on her behalf after all these years and in therapy."

Third, even if the court erred in failing to hold an evidentiary hearing on the petition, any error was harmless because "mother here wholly fails to identify additional evidence she would have presented at an evidentiary hearing that would have established" a change of circumstances and that increased visitation with her would have been in minor's best interest. (*In re G.B.*, *supra*, 227 Cal.App.4th at p. 1164.) As noted *ante*, the court discredited mother's testimony at the section 366.26 hearing. On appeal, mother fails to identify any further evidence, which, if admitted at an evidentiary hearing, would support an order granting the relief requested. The juvenile court acted within its discretion in denying the petition.

B. Order Terminating Visitation

Mother contends insufficient evidence supports the court's order terminating her visitation with minor such that it deprived her of "a fair chance at litigating the parental benefit and sibling exceptions to adoption."[17] She maintains the court inappropriately delegated visitation decisions to the department and minor. We disagree.

---

[17] Mother contends the court denied her the right to testify about minor's relationship with her siblings. Mother fails to provide a pinpoint citation to the record for such an order. Our review of the record discloses no such order. Moreover, minor was aware she could testify but chose not to.

"'We review . . . visitation orders for an abuse of discretion, and apply the substantial evidence standard to the [juvenile] court's factual findings.  [Citation.]  A court abuses its discretion in making a[n] . . . order if there is no reasonable basis on which it could conclude that its decision advanced the best interests of the child. [Citation.]'"  (*Noble v. Superior Court* (2021) 71 Cal.App.5th 567, 578; accord *S.Y. v. Superior Court* (2018) 29 Cal.App.5th 324, 333-334; *In re Brittany C*. (2011) 191 Cal.App.4th 1343, 1356 [during reunification services]; *In re C.B.* (2010) 190 Cal.App.4th 102, 123, fn. 5 [after reunification services have been terminated, visitation orders should be focused on the best interest of the child].)

"'[T]he court abdicates its discretion [when it] permits a third party, including the dependent child, to determine whether any visitation will occur, . . .  [Citations.]'"  (*In re Korbin Z.* (2016) 3 Cal.App.5th 511, 518-519.)  "Even after family reunification services are terminated, visitation must continue unless the court finds it would be detrimental to the child.  [Citation.]"  (*In re Hunter S.* (2006) 142 Cal.App.4th 1497, 1504.)  "'Only when the court delegates the discretion to determine whether *any* visitation will occur does the court improperly delegate its authority . . . .'  [Citation.]"  (*Christopher D. v. Superior Court* (2012) 210 Cal.App.4th 60, 72-73.)  An improper order delegating authority over visitation is subject to a harmless error analysis.  (*In re Chantal S*. (1996) 13 Cal.4th 196, 214 ["Even assuming arguendo that the order delegated too much judicial discretion, father is not prejudiced thereby."])

*1. Delegation of Visitation.*

At a hearing on January 20, 2023, the court gave the department authority to immediately suspend any visit, and future visits, if mother continued to give minor gifts and discuss the case. The court also agreed to allow minor to refuse to visit with mother.

Here, the court only permitted the department authority to suspend visitation if mother failed to abide by certain protocols of which she had already been repeatedly warned. Thus, the court did not delegate authority to the department; the court itself determined that visitation would be detrimental if mother continued to buy gifts for minor and/or discuss the case with her. Moreover, the court did not permit the department to determine whether *any* visitation would occur.

To the extent the court erred in delegating visitation to minor, we hold any error was harmless beyond a reasonable doubt. First, minor never actually canceled *any* visits; thus, mother was not deprived of *all* visitation with minor. In fact, minor only terminated visitation early three times.

Second, it is apparent the juvenile court made an implied finding of detriment regarding visitation between minor and mother when mother would discuss the case and give minor gifts. As early as July 10, 2019, years prior to the orders appealed in this case, the court found mother's behavior during visits "unacceptable." "The one thing I can do is order an immediate stoppage of the visit and no further visits if there is any behavior that has occurred, such as coaching, passing notes, whispering. If that occurs, I'm giving absolute authority to the Department to stop that visit, and then not allow any

45

further visits." The court ordered visitation between minor and mother to be "closely monitored." (*R.Y. II*, *supra*, E080337.)

In a report filed January 14, 2020, the social worker noted mother continued to have difficulty setting limits for minor, such as offering to buy her dessert before eating her meal, giving her money, and giving her all the toys she requested. (*R.Y. II*, *supra*, E080337.) On September 7, 2022, the social worker reported mother continued to purchase minor whatever she wanted; minor would ask for things because she knew mother would buy them immediately. (*R.Y. II*, *supra*, E080337.) Yet again, in a report filed on October 27, 2022, , the social worker reported that mother continued to purchase items at minor's request, which minor left unopened and unused in a corner of her room. (*R.Y. II*, *supra*, E080337.)

At the hearing on November 8, 2022, the department argued mother continued "to try to pressure the minor to move back home. She brings up the [boyfriend] in conversation stating he loves her and tries to bring up memories for the minor." She continued to buy the minor whatever she wanted. Minor's counsel noted, "Mother's still making inappropriate statements to the child." (*R.Y. II*, *supra*, E080337.)

In the January 5, 2023, report, the maternal aunt continued to describe the visits as "'inappropriate' which consists of the mother buying the [minor] many things which the child does not use later or buying the minor plunging bras." Minor and mother argued during visits. In the January 18, 2023, report, mother was described as manipulating minor "with gifts and promises to purchase items for her."

46

At a hearing on January 20, 2023, for the second time, the court ordered mother only be permitted to continue to visit with minor under strict supervision: "Mom's ordered not to discuss the case, the possibility or the outcome with the minor." "There's no whispering. No secrets, you know, whatever. No gifts. No . . . manipulation." "I'll give authority for [the department] to immediately suspend any visit and future visits if Mom violates any of the rules that" the department "established for the minor's protection." The court also agreed to allow minor to refuse to visit with mother.

The results of mother's violations of rules during visits included minor becoming "extremely aggressive." (*R.Y. II*, *supra*, E080337.) Minor would have difficulty staying asleep, would have nightmares, and wet the bed. She also tended "to exhibit more clinginess and [would] remain with the [maternal aunt] constantly at her side, until [she] regulates back into routine and feels secure again." "It is reported after the visits, the child tends to experience increased negative behaviors that include nightmares and mood swings." Minor reported her anxiety got worse in the lead up to visits with mother. When there was a gap in visitation minor's negative behaviors had decreased. Minor reported visits with mother were a "stressor" for her.

Even after the court's order and several warnings, mother continued "to attempt to give the child gifts at her visits." Mother continued to make statements to minor during the visits in which she promised various items to minor once "mother straightens things out with the judge." For these very reasons, at a hearing on August 10, 2023, the court found mother's visits with minor detrimental and ended all visitation between them.

Thus, the court's order of January 20, 2023, permitting the department or minor to terminate or refuse visitation contained an implied finding that visitation wherein mother gave gifts to minor or spoke about the case with her were detrimental. Moreover, any error was harmless because the record demonstrates beyond a reasonable doubt (see *infra* C) that mother would not have been able to bring herself within the parental benefit exception even if the minor had been required to attend all visitation with mother.

Mother contends *In re Hunter S.*, *supra*, 142 Cal.App.4th 1497 compels reversal in this case. However, the *Hunter S.* court never made a finding of detriment, and its order resulted in the denial of all visitations. Here, as discussed *ante*, mother continued to visit with minor and the court made both implied and express findings of detriment.

2. *Termination of Visitation*.

At the hearing on August 10, 2023, the court found mother's visits with minor detrimental and ended all visitation between them.

For all the reasons discussed *ante* in (B)(1), the court acted well within its discretion in expressly finding visitation detrimental to minor and ending it. After two orders, numerous complaints in the reports, and several warnings, mother continued to discuss the case with minor and manipulate her by buying her off with gifts. (*R.Y. II*, *supra*, E080337.)

The results of visits with minor caused minor to suffer sleep difficulties, anxiety, mood swings, and insecurity. Minor had increased negative behaviors after visits. When

there was a gap in visitation, minor's negative behaviors had decreased. Minor reported visits with mother were a "stressor" for her. (*R.Y. II*, *supra*, E080337.)

Moreover, the court terminated mother's once monthly visitation on August 10, 2023, and terminated her parental rights less than one month later on September 7, 2023. Thus, mother missed only one visit with minor due to the order. Again, any error was harmless because the record demonstrates beyond a reasonable doubt (see *infra* C) that mother would not have been able to bring herself within the parental benefit exception even if the minor had been required to attend *one* additional visit with mother. The court acted within its discretion in terminating visitation.

C. Beneficial Parental Relationship Exception to Termination of Parental Rights

Mother contends the court erred in declining to apply the parental relationship exception to termination of her parental rights. We disagree.

"[T]he goal at the section 366.26 hearing is 'specifically . . . to select and implement a permanent plan for the child.' [Citations.] To guide the court in selecting the most suitable permanent arrangement, the statute lists plans in order of preference and provides a detailed procedure for choosing among them. [Citation.] According to that procedure, the court must first determine by clear and convincing evidence whether the child is likely to be adopted. [Citation.] If so, and if the court finds that there has been a previous determination that reunification services be terminated, then the court shall terminate parental rights to allow for adoption. [Citation.] But if the parent shows that termination would be detrimental to the child for at least one specifically enumerated

49

reason, the court should decline to terminate parental rights and select another permanent plan. [Citation.] As we have previously explained, '[t]he statutory exceptions merely permit the court, in exceptional circumstances [citation], to choose an option other than the norm, which remains adoption.' " (*Caden C.*, *supra*, 11 Cal.5th at pp. 630-631.)

"The exception at issue in this case is limited in scope. It applies where '[t]he court finds a compelling reason for determining that termination would be detrimental to the child due to one or more of the following circumstances: [¶] (i) The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship.' [Citation.] From the statute, we readily discern three elements the parent must prove to establish the exception: (1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Caden C.*, *supra*, 11 Cal.5th at p. 631.) It is the parent who must prove all three elements by a preponderance of the evidence; the parent must "show a '*compelling* reason for determining that termination would be detrimental to the child . . . .'" (*Id.* at p. 635.)

Here, the court found mother had regular visitation with minor despite its recent finding that such visitation was detrimental to minor. Thus, we address only the second and third prongs, beneficial relationship and detriment.

*1. Beneficial Relationship.*

On the second element, "the parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the

50

child would benefit from continuing the relationship." (*Caden C.*, *supra*, 11 Cal.5th at p. 636.)  Courts "assess whether 'the child would benefit from continuing the relationship.' [Citation.]  Again here, the focus is the child.  And the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.'" (*Id.* at p. 632.)  "[C]ourts often consider how children feel about, interact with, look to, or talk about their parents. [Citations.]  Doing so properly focuses the inquiry on the child . . . ." (*Ibid.*)

We review whether there is a beneficial relationship for substantial evidence.  (*Caden C.*, *supra*, 11 Cal.5th at p. 639.)  "[I]n assessing visitation and the relationship between parent and child, the court must make a series of factual determinations.  These may range from the specific features of the child's relationship with the parent and the harm that would come from losing those specific features to a higher-level conclusion of how harmful in total that loss would be.  The court must also determine, for the particular child, how a prospective adoptive placement may offset and even counterbalance those harms.  In so doing, it may make explicit or implicit findings ranging from specific benefits related to the child's specific characteristics up to a higher-level conclusion about the benefit of adoption all told.  All these factual determinations are properly reviewed for substantial evidence." (*Id.* at p. 640.)

Minor's counsel conceded that minor loved mother.  (*R.Y. II*, *supra*, E080337.)  Nonetheless, substantial evidence supported the court's finding that the child did not have

51

a *beneficial* relationship with mother. Here, mother had the burden of proving each child had "a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship." (*Caden C.*, *supra*, 11 Cal.5th at p. 636.)

However, minor suffered for years in mother's custody. The juvenile court sustained allegations that in mother's custody, minor was subjected to *severe* physical abuse, exposure to domestic violence, and denial of medication. Mother admitted in her testimony that she locked minor in her room without carpet, heat, or light. Mother admitted she often kept minor home from school. (*R.Y. II*, *supra*, E080337.)

Minor did not want to return to mother's care. During visits, minor had "no overwhelming reaction to saying hello or goodbye to" mother. (*R.Y. II*, *supra*, E080337.) After two orders, numerous complaints in the reports, and several warnings, mother continued to discuss the case with minor and attempt to manipulate her by buying her off with gifts. (*R.Y. II*, *supra*, E080337.)

Minor did not want to visit with mother. She only did so because she felt obligated to. Minor was frustrated with lies that mother was telling the Court. She and mother "just" fought during visits. Minor eventually started ending "each visit with the mother approximately 30 minutes to one hour early."

The results of visits with minor caused minor to suffer sleep difficulties, anxiety, mood swings, and insecurity. Minor had increased negative behaviors after visits. When

there was a gap in visitation, minor's negative behaviors had decreased. Minor reported

visits with mother were a "stressor" for her. (*R.Y. II*, *supra*, E080337.)

On the other hand, minor repeatedly expressed her desire to live with and be adopted

by the maternal aunt. In the maternal aunt's home, minor had "access to all other

maternal relatives." Minor received phone calls from her brother, H.H. The maternal

aunt reported minor was "doing very well" in the placement; she was attending school

every day without incident. Since she had been placed with her maternal aunt, most of

minor's behavioral problems had lessened; she had "made amazing progress." The

maternal aunt was "committed to caring for [minor] to the level of adoption and wants to

move forward with the process of adoption." Minor was happy, smiling, and bonded

with the maternal aunt. (*R.Y. II*, *supra*, E080337.)

The court discredited mother's testimony regarding their bond. The court's

determination that mother and minor did not have a beneficial bond was supported by

substantial evidence.

## 2. *Detriment*

"[I]n assessing whether termination would be *detrimental*, the trial court must

decide whether the harm from severing the child's relationship with the parent outweighs

the benefit to the child of placement in a new adoptive home. [Citation.] By making this

decision, the trial court determines whether terminating parental rights serves the child's

best interests." (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) "Because terminating parental

rights eliminates any legal basis for the parent or child to maintain the relationship, courts

must assume that terminating parental rights terminates the relationship. [Citations.] What courts need to determine, therefore, is how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Id.* at p. 633.) "[T]he question is just whether losing the relationship with the parent would harm the child to an extent not outweighed, on balance, by the security of a new, adoptive home." (*Id.* at p. 634.)

"[W]hether termination of parental rights would be detrimental to the child due to the child's relationship with his parent—is discretionary and properly reviewed for abuse of discretion." (*Caden C.*, *supra*, 11 Cal.5th at p. 640.) "A court abuses its discretion only when ""the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination."" [Citation.] But ""[w]hen two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.""" (*Id.* at p. 641.)

The court acted within its discretion in finding that termination of mother's parental rights would not be detrimental to minor. Here, as discussed *ante*, mother failed to establish a *beneficial* relationship between her and minor.

On the other hand, after 13 placements, minor had been in the care of the maternal aunt for almost 16 months. (*R.Y. II*, *supra*, E080337.) A majority of minor's prior, problematic behaviors, which "ranged from oppositional, defiant, cussing[,] and temper tantrums[,]" had lessened since being placed with the maternal aunt. Minor had become stable in the maternal aunt's care. (*R.Y. II*, *supra*, E080337.)

Minor repeatedly expressed her desire to live with and be adopted by the maternal aunt. In the maternal aunt's home, minor had "access to all other maternal relatives." Minor received phone calls from her brother, H.H. The maternal aunt reported minor was "doing very well" in the placement; she was attending school every day without incident. Since she had been placed with her maternal aunt, most minor's behavioral problems had lessened; she had "made amazing progress." The maternal aunt was "committed to caring for [minor] to the level of adoption and wants to move forward with the process of adoption." Minor was happy, smiling, and bonded with the maternal aunt. (*R.Y. II*, *supra*, E080337.)

The placement "included family trips, family outings with extended family members[,] and important family traditions. The closeness of [minor's] relationship with the maternal aunt ha[d] been noticeably observed by the Department's staff."

Importantly, the juvenile court found minor solely *specifically* adoptable, not generally adoptable. Thus, minor would be unlikely to find another adoptive placement. Mother failed to make a compelling showing that the loss of the minor's relationship with her would harm minor to an extent not outweighed, on balance, by the security of a new, adoptive home with the maternal aunt. Thus, the court acted within its discretion in determining the circumstances were not exceptional, such that the termination of mother's parental rights would not be detrimental to minor.

III.  DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS


McKINSTER
Acting P. J.


We concur:


MILLER
J.


FIELDS
J.